FILED

2005 Jun-21  AM 09:56
U.S. DISTRICT COURT
N.D. OF ALABAMA



# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | | |
|---|---|---|
| SEROLOGICAL SPECIALTY<br>BIOLOGICS, INC.,<br>    Plaintiff(s), | ]<br>]<br>] | |
| | ] | |
| vs. | ] | CV-04-CO-0710-S |
| | ] | |
| ANITA HYDE,<br>    Defendant(s). | ]<br>] | |
| | | |
| SOUTHERN BLOOD SVCS., INC.,<br>    Plaintiff(s), | ]<br>] | |
| | ] | |
| vs. | ] | |
| | ] | CV-04-CO-1351-S |
| SEROLOGICALS SPECIALTY<br>BIOLOGICS., INC., GRADIPORE<br>LTD., and ANITA HYDE,<br>    Defendant(s). | ]<br>]<br>]<br>] | |
| | | |
| SEROLOGICALS SPECIALTY<br>BIOLOGICS, INC.,<br>    Counter-Plaintiff(s), | ]<br>]<br>] | |
| | ] | |
| vs. | ] | |
| | ] | |
| SOUTHERN BLOOD SVCS., INC.<br>and DAVID T. MORAD,<br>    Counter-Defendant(s). | ]<br>]<br>] | |

SEROLOGICAL SPECIALTY   ]
BIOLOGICS, INC.,     ]
   Plaintiff(s),     ]
             ]
   vs.        ]  CV-04-CO-2589-S
             ]
CAROL BEARDEN,     ]
   Defendant(s).    ]

## MEMORANDUM OF OPINION

This action in diversity was initiated when Serological Specialty Biologics Inc. (hereinafter "SSBI") brought suit against Anita Hyde, alleging Hyde, a rare source blood plasma donor, breached her donor contract with SSBI.  (CV-04-CO-0710-S.)   Thereafter, Southern Blood Services, Inc. (hereinafter "SBS") filed a complaint seeking a declaratory judgment that contracts between SSBI and its donors were unenforceable and that SBS's business with those contracted donors did not constitute a tortious interference.  SSBI counterclaimed against SBS and David Morad, alleging tortious interference with donor contracts, misappropriation of trade secrets and, against Morad alone, breach of his confidentiality agreement with SSBI. (CV-04-CO-1351-S.)  SSBI also filed a separate suit against Carol Bearden, another rare source blood plasma donor, who allegedly breached her donor

contract with SSBI.  (CV-04-CO-2589-S.)  The actions were consolidated in this Court under case number CV-04-CO-0710-S, and the parties were told to file all documents in that case.  (CV-04-CO-0710-S, Docs. 19, 24).  The cause is presently before the Court for consideration of summary judgment motions filed by SSBI (Doc. 54), Anita Hyde (Doc. 56), and SBS, David Morad, and Carol Bearden (Doc. 59).  SBS, Morad, and Bearden also filed a motion to strike Exhibit N to SSBI's response.  (Doc. 70.)  The motions have been fully briefed and are ready for consideration.

I.    The Standard of Review.

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the evidence] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant can meet this burden by presenting

evidence showing that there is no genuine dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322-23. In evaluating the arguments of the movant, the court must view the evidence in the light most favorable to the nonmoving party. *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996).

Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)). "A factual dispute is genuine only if a 'reasonable jury could return a verdict for the nonmoving party.'" *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002) (quoting *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991)).

II.    Statement of Facts.

Except as otherwise noted, the parties agreed to the following facts in their Joint Status Report, filed March 25, 2005. (Doc. 77.)

SSBI is in the business of collecting, analyzing and processing human blood plasma, which is ultimately sold to customers for use in the manufacture of specialized therapeutic and diagnostic products -- the source plasma collection industry.  SSBI markets and sells rare human antibodies and sells components to pharmaceutical manufacturers who in turn produce specialized therapeutic and diagnostic products.  (Joint Status Report, Doc. 77,  ¶¶ 3, 4.)

Plasma is the clear liquid portion of blood that remains after red cells, leukocytes and platelets are removed. It consists of water, salts, enzymes, antibodies, and other proteins.  SSBI collects plasma from donors through a procedure called plasmapheresis, which is very similar to drawing whole blood except that, after the plasma is separated out of the blood, the red cells are returned to the donor. A donor's blood is extracted through a process commonly referred to as "bleeding" during a visit to a specially equipped facility.   This is an invasive medical procedure which is "very

personal and private to the donor" and involves inherent health risks, including the possibility that the donor could contract a disease or develop an unwanted antibody and be rendered unable to donate again. (Joint Status Report, ¶¶ 14-17.)

Not everyone's blood plasma contains marketable antibodies. SSBI's donor location efforts encompass the entire United States and include developing and maintaining relationships with doctors, hospitals and independent laboratories and media advertising campaigns. On average, SSBI expends $600,000 annually toward locating, recruiting and managing donors. Once SSBI identifies a potential donor, he or she is carefully screened, including a physical examination, and a comprehensive health history and lifestyle interview. Only after the potential SSBI donor passes the initial screening may plasma donations be accepted. SSBI subjects each donor to a rigorous validation process designed to detect and exclude at-risk donors, and SSBI rejects any donated plasma that fails the validation process. Plasma that passes the SSBI validation process is held in inventory a minimum of 60 days to allow for the discovery of latent defects. Repeat donors must be screened and their blood tested prior to each donation.    (Joint Status

Report, ¶¶ 18-27.)  In some cases, SSBI must pair the donor with another immunogen cell donor having a compatible phenotype in order to bring about the donor's production of marketable antibodies. In such cases, FDA regulations require SSBI to test the immunogen cell donor for two years before his/her red cells can be injected into the plasma donor. As a result of such rigorous standards, SSBI refers to these immunogen cell donors as "pedigree donors." (Joint Status Report, ¶¶ 28-30.)

In September 1997, SSBI acquired Bio-Lab, Inc. and Med-Lab, Inc. for $8.5 million. Bio-Lab and Med-Lab were in the source plasma collection business. Joseph Morad was one of three owners of Bio-Lab and Med-Lab, and he owned the building in which Bio-Lab operated. As part of the purchase, SSBI acquired Bio-Lab's inventory of 200 to 300 known, qualified blood plasma donors, including Anita Hyde and Carol Bearden.  (Joint Status Report, ¶¶ 35-41.)  Since 1992, SSBI and its predecessors have sought to enter into a contract with each of its rare antibody donors. (Joint Status Report, ¶ 32.) Ms. Bearden and Ms. Hyde entered into donor contracts with SSBI.

Ms. Bearden's blood has a rare antibody, known in the industry as "anti-C," produced as an immunological response to the introduction of blood with

a different factor into her bloodstream.  She began donating blood plasma at Bio-Lab around 1990.  Through her association with Bio-Lab, she knew and trusted Joseph Morad and his son, David.  When Bio-Lab was purchased by SSBI, Ms. Bearden entered into a Donor Contract with SSBI. Ms. Bearden was uncomfortable about signing the SSBI Donor Contract and, in part because she has children and grandchildren in Birmingham, included a condition that she would only donate blood in Birmingham unless the parties mutually agreed to a change of location. (Joint Status Report, ¶¶ 43-46, 54-55.)

In 1987, Anita Hyde first discovered that she had a rare antibody in her blood colloquially known as "Duffy B."  Properly immunized, Ms. Hyde's blood plasma produces this rare antibody.  In 1990, after seeing an ad in the paper, Ms. Hyde began donating at Bio-Lab in Birmingham. She donated with Bio-Lab from 1990 until Bio-Lab was sold to SSBI, at which time she entered into a Donor Contract with SSBI and continued to donate blood at the former Bio-Lab Donor Center in Birmingham until SSBI closed the Birmingham facility in 2003.  (Joint Status Report, ¶¶ 48- 52, 56.)

When SSBI acquired Bio-Lab, it acquired stored immunogen cells appropriate for immunization of Ms. Bearden and Ms. Hyde for between a year and a half to two years after the sale. (Joint Status Report, ¶ 58.)

In early 2003, when Bearden appeared in Birmingham to make a scheduled donation, she was informed by SSBI that it was closing the Birmingham facility and she would be required to donate blood at another SSBI facility if she wished to continue donating. Ms. Bearden was not happy with this development and so informed SSBI. (Joint Status Report, ¶¶ 62-64.) After factoring in the difficulty and time involved with traveling from Memphis to donate, Bearden began donating at the SSBI facility in Pensacola, Florida. She was displeased with SSBI and even told them that she felt she had been "jerked around." She did not like being required to travel further, and she had "little comfort" with SSBI's employees in Atlanta, and "no comfort level" with Jesse McCorvey, SSBI's officer in charge of donor schedules and organizations. (Joint Status Report, ¶¶ 73-75.)

About March 25, 2003, Hyde was presented with a new SSBI donor contract at SSBI's Marietta, Georgia, facility. Hyde told SSBI that she had a problem with continuing to drive to Atlanta to fulfill her obligation. She said

that, if there were a center in Birmingham where she could donate, she would quit going to SSBI and donate there instead.  (Joint Status Report, ¶¶ 65-67.)  Ms. Hyde signed the donor contract on May 6, 2003, at the SSBI Marietta facility.  Ms. Hyde specifically negotiated her donor fee and, although she asked for substantially more money, she ultimately received an increased donor fee from $500 to $650 per donation and a $200 travel allowance.  On February 11, 2004, SSBI told Hyde that she could draw plasma in Birmingham as an alternative.  (Joint Status Report, ¶¶ 68-71.)

Southern Blood Services, Inc. ("SBS") is an Alabama corporation located in Birmingham which is engaged in the source plasma collection industry, in competition with SSBI.  SBS is owned and operated by Joseph Morad, the former owner of Bio-Lab.  (Joint Status Report, ¶¶ 7-9.) Between March 2003 and March 2004, SBS was contacted by individuals who previously had been clients at Bio-Lab and had switched to SSBI in connection with the sale of Bio-Lab's assets.  The donors were inquiring whether Joseph Morad would be opening a new facility in Birmingham. Ms. Bearden contacted SBS and asked if she could donate her blood, blood plasma, and or blood derivatives at SBS. Since January 26, 2004, she has been selling her blood plasma exclusively to

SBS.  Since January 8, 2004, Ms. Hyde has been selling her blood plasma exclusively to SBS.  SBS does not require its donors to sign contracts.  Ms. Bearden and Ms. Hyde testified that, even if prevented from donating with SBS, they will not return to SSBI to donate.  SSBI has acknowledged that the donors have the right to refuse to donate with SSBI.  Despite directed efforts, SSBI has been unable to locate any other donor having marketable quantities of the same antibodies as Ms. Bearden or Ms. Hyde.  (Joint Status Report ¶¶ 76-92.)

III.    Discussion.

SSBI contends it is entitled to summary judgment as to SBS's claim for declaratory judgment because SBS lacks standing to challenge the Donor Contracts.  Alternatively, SSBI contends the Donor Contracts are valid and enforceable, so that the request for a judgment declaring their invalidity should be denied.  (Docs. 54, 55.)

Anita Hyde contends she is entitled to summary judgment as to SSBI's claim for breach of contract because the Donor Contract she signed was a contract of adhesion.  (Docs. 56, 57.)  In her reply, she joined in the

arguments made by SBS, Carol Beardon, and David Morad (the "SBS Movants"). (Doc. 73.)

The SBS Movants contend they are entitled to summary judgment as to SSBI's claims for tortious interference and breach of contract because the Donor Contracts upon which SSBI relies are unenforceable restraints of trade and there is no mutuality of obligation. (Doc. 59.) SBS and David Morad also argue they are entitled to summary judgment as to SSBI's claim for misappropriation of trade secrets because the information referenced does not constitute a trade secret under the circumstances. Morad also argues he is entitled to summary judgment as to the separate breach of contract claim asserted against him.

Because the resolution of most of the summary judgment motions will turn on the validity of the Donor Contracts, the Court will first address that issue as raised in the motions of SSBI and the SBS Movants, and as adopted by Anita Hyde in her reply.

A.     The Validity of SSBI's Donor Contracts.

The SBS Movants contend that the Donor Contracts upon which SSBI bases its claims are unenforceable restraints of trade in that they prevent the blood donors who contract with SSBI from donating to any other entity. Georgia law prohibits contracts or agreements tending to defeat or lessen competition, or in general restraint of trade. *Uni-Worth Enterprises, Inc. v. Wilson*, 261 S.E.2d 572, 574 (Ga. 1979); *W. R. Grace & Co. v. Mouyal*, 422 S.E.2d 529, 531 (Ga. 1992)(citing 1983 Ga. Const. Art. III, Sec. VI, Para. V(c); and OCGA § 13-8-2).[1]  However, certain contractual provisions, such as covenants against competition in employment contracts, are considered to be in partial restraint of trade and are upheld if the imposed restraint is reasonable, is founded on valuable consideration, is reasonably necessary to protect the interest of the party in whose favor it is imposed, and does not unduly prejudice the interests of the public. *W. R. Grace*, 262 S.E.2d at 531. Whether the imposed restraint is reasonable is a question of law for determination by the court. *Id*.  The court must consider the nature and

---

[1]The Donor Contracts provide that they "shall be governed and construed in accordance with the laws of the State of Georgia." (See, e.g., Carol Bearden Donor Contract, Art. 9, Doc. 68, Ex. B). The parties have consistently cited Georgia law in discussing the validity of the contracts, and the Court has no reason to revisit this question.

extent of the trade or business, the situation of the parties, and all other circumstances.  *Id.*  A three-element test of duration, territorial coverage, and scope of activity has evolved as a "helpful tool" in examining the reasonableness of the particular factual setting to which the restraint is applied.  *Id.*  (citations omitted).

In response to the SBS Movants' motion, SSBI contends that its Donor Contracts are not void general restraints of trade, but are "exclusive dealing contracts" which are expressly recognized in Georgia law, pointing to Ga. Code Ann. § 11-2-300.  SSBI admits these contracts, like covenants not to compete in employment contracts, must meet the "reasonableness" test imposed by Georgia law if they are not to run afoul of the Georgia constitutional provision prohibiting restraints of trade.  *See PCS Joint Venture Ltd. v. Davis*, 465 S.E.2d 713, 714 (Ga. 1995).  SSBI argues the Donor Contracts are reasonable restraints of trade under application of the standard three-element test of duration, territorial coverage and scope of activity.  *Allen v. Hub Cap Heaven, Inc.*, 484 S.E.2d 259, 264 (Ga. App. 1997).

The Donor Contracts provide, in pertinent part, "Donor agrees and promises that during the term of this Contract and for a period of six (6) months thereafter, Donor will provide blood, blood plasma, or other blood derivatives exclusively to [SSBI] and will not provide or promise to provide blood, blood plasma, or other blood derivatives to any other person or entity." (Doc. 69, Ex. B, Bearden 2002 Contract, ¶ 2.)[2] The Donor Contract further provides, "[t]his Contract shall have an initial term of three (3) years and shall automatically be extended for successive two (2) year terms unless [SSBI] or Donor shall give written notice of non-renewal to the other party hereto no less than sixty (60) days prior to the end of the then effective term." *Id*.

      1.    Term.

SSBI argues the three year duration of the Donor Contracts is reasonable because the donors are not precluded from selling blood plasma at all during that period, but are merely precluded from selling blood plasma

---

[2]Jesse McCorvey, the SSBI officer in charge of donor schedules and organization, (Joint Status Report, Doc. 77, p. 13, ¶ 75), testified that all the contracts signed by donors were identical, and were three year contracts. ( Doc. 67, Pltff's Ex. K (sealed).)

to anyone other than SSBI.[3] However, restricting the sale of a product to one purchaser is the hallmark of an exclusive dealing contract. *Wedgewood Carpet Mills*, 254 S.E.2d at 420 (contract provided that appellee could not sell similar yarn to any customer other than Wedgewood, at any price at any location, for the period of one year); *PCS Joint Venture*, 465 S.E.2d at 714 (oral agreement between a fertilizer manufacturer and distributor giving distributor the exclusive right to sell a special grade of fertilizer manufactured by the manufacturer was void as an unreasonable restraint of trade). Such contracts must be reasonable in duration. *Shanco Int'l, Ltd. v. Digital Controls, Inc.*, 312 S.E.2d 150 (Ga. App. 1984)(distributor's agreement with manufacturer of video game, according to which manufacturer could not market, sell or distribute game to anyone but distributor, was an invalid

---

[3]SSBI admits the six-month period beyond the contract term during which the donor is precluded from donating to anyone is a noncompete provision, but contends the six-month restriction is reasonable in the circumstances given the time and expense required to locate source plasma donors having rare antibodies, the two-year investment required to locate and qualify a "pedigree donor" whose red blood cells are used to stimulate growth of the antibodies in the plasma donor, and the possibility that a "poaching" competitor, who has not gone to the time and expense of finding a pedigree donor, might take advantage of latent antibodies in the blood of a plasma donor who has been inoculated by SSBI. SSBI also argues that donors can avoid automatic renewal by giving 60 days notice, and points to evidence tending to contradict the SBS Movants' evidence that donors were required to execute contracts prior to giving each donation. In view of the Court's conclusion that the three year duration of the exclusive dealing arrangement is unreasonable, the Court need not consider the post-contractual arrangements.

restraint of trade because there were no time or territorial limitations). There does not appear to be any Georgia case discussing the appropriate time period for an exclusive dealing contract.  However, in *Allen v. Hub Cap Heaven*, the Georgia Court of Appeals discussed the appropriate time period for noncompetition covenants in employment contracts, observing that the Supreme Court of Georgia has refused to enforce covenants purporting to be effective for two years within 10 miles, one year within 5 miles, two years in three counties, 18 months within 50 miles of any place the company operates, or within three years in 16 counties.  484 S.E.2d 259, 265 (Ga. App. 1997).  While these examples are not directly analogous in that they involve covenants imposed during post contract periods, to the extent they serve as a guide, they indicate the three year period during which the SSBI donors are proscribed from donating to any other entity is not reasonable. Furthermore, SSBI has not attempted to show that the three year period is reasonable in these circumstances.   "Restrictions which place greater limitations than are necessary to protect the employer render the contract void and unenforceable."  *Watkins v. Avnet*, 177 S.E.2d 582, 584 (Ga. App. 1970).

SSBI argues the six-month post-contractual period during which donors cannot give blood to any entity is reasonable given the time and expense required to locate source plasma donors having rare antibodies, the two-year investment required to locate and qualify a "pedigree donor" whose red blood cells are used to stimulate growth of antibodies in the plasma donor, and the possibility that a "poaching" competitor who has not gone to the time and expense of finding a pedigree donor might take advantage of latent antibodies in the blood of a plasma donor who has been inoculated by SSBI. However, SSBI makes no attempt to show that these factors justify the three-year contractual limitation.  The undisputed evidence that Hyde and Bearden did not sign contracts until Bio-Lab was purchased by SSBI, and that SBS does not require its donors to sign contracts, indicates the three-year exclusivity provision is not, in every circumstance, economically necessary to protect the business interests of a source plasma collector.

   2. Territory.

Even if the duration requirement of the Donor Contracts was reasonable, the lack of territorial limitations would be fatal.  SSBI admits the Donor Contracts are not limited to any particular geographic territory, but

contends that an express statement of geographic limitation is not determinative of the contracts' reasonableness. Relying on *W. R. Grace*, 422 S.E.2d at 532-33, SSBI argues that a territorial limitation is anachronistic in the context of modern business practices, because source plasma collection companies solicit donors throughout the country and arrange and pay for those remote donors to travel and donate at pertinent donor centers. *Id.*[4] In *W. R. Grace*, the Georgia Supreme Court answered a question certified by the United States Court of Appeals for the Eleventh Circuit regarding the enforceability of a non-solicitation clause in an employment contract which, for 18 months after the cessation of employment, prohibited the former employee from soliciting the employer's clients that the employee actually contacted during his employment. The clause did not include an explicit geographical limitation. The Georgia Supreme Court said that the need for expressing a territorial restriction in geographic terms becomes less important when the group which the employer wishes to protect from solicitation is narrowly defined with sufficient specificity. SSBI's reliance on

---

[4]The W. R. Grace court did recognize that modern businesses may have extensive worldwide business contacts, but the court did not abrogate the general rule, as discussed below, that a territorial restriction must be defined with focus on the employee's activities rather than the employers' business.

*W. R. Grace* is inappropriate for at least three reasons.  First, the SSBI donors are not informed of any narrowly defined, sufficiently specified group with whom they must avoid doing business as an alternative to not being informed of a geographical limitation.[5]  Second, SSBI's suggestion that the *W.R. Grace* court would find a geographically unlimited restriction reasonable given the realities of SSBI's wide-ranging business dealing is incorrect; rather, the court observed that restrictions related to the area in which the employer does business are generally unenforceable due to overbreadth and that reasonable restrictions must focus on the scope of the employee's activities.  To the extent the relationship between SSBI and the donors can be analogized to the employer/employee relationship in *W.R. Grace*, the scope of the SSBI donors' activities does not justify an unlimited territorial restriction.  Third, the employment contract at issue in *W. R. Grace* prohibited solicitation of business contacts made by the employee during his employment, and the court recognized the employer had a legitimate

---

[5]In its brief in support of summary judgment (Doc. 54, p. 18) SSBI argues that, similar to the *W. R. Grace* contract, the Donor Contracts are restricted by group rather than territory, and that the group is "other companies in the source plasma collection industry." That assertion is factually incorrect.  The Donor Contracts state that donors may not provide blood to "any other person or entity, including but not limited to, any blood collection agency, plasma center or similar business or organization . . . . "  (SSBI Donor Contract, Doc. 61, Ex. F, ¶ 2.)

business interest in protecting its customer relations established or nurtured by the former employee. SSBI does not have a corresponding legitimate interest in prohibiting the donors from making their own business contacts. In a case decided after W. R. Grace, which specifically discussed exclusive dealing contracts, the Supreme Court of Georgia held that an exclusive dealing contract which lacks a territorial limitation is unenforceable. *PCS Joint Venture*, 465 S.E.2d at 714.  The PCS court observed that when there are no territorial limits in an exclusive dealing contract, the "net effect of such an agreement is to exclude all other competition from selling and distributing the particular product, . . ." *Id*.  The Donor Contracts are, therefore, invalid restraints of trade under Georgia law because they lack territorial limitation.

> 3.    Scope.

The SBS Movants argue that the Donor Contracts are unreasonable in scope because the restricted activity, the donating of human body tissue, is "highly personal and potentially dangerous." (Doc. 60, p. 28).  In response, SSBI contends that the "scope of activity" evaluation must focus on the reasonableness of the contractual prohibition rather than on the subject of

the prohibition.  SSBI contends its contractual restrictions on blood donations are reasonable because they do not entirely prohibit donors from selling blood plasma, donors are free to choose with whom they will contract, and the restrictions promote competition by encouraging source plasma collectors to develop and identify new sources of blood plasma supply rather than "poaching" blood donors identified by competitors. (Doc. 69, pp. 9-10.)

SSBI has not shown that Georgia or Alabama has officially sanctioned an exchange of money for blood, but the Court recognizes that the practice has existed for most of this century.  However, restrictions on blood "donors" like those included in the Donor Contracts are, apparently, unprecedented for the parties have not cited, and this Court has not found, any parallel in the statutory or case law.  Commercial transactions in human tissue, particularly blood products, are a quietly acknowledged aspect of modern society,[6] but the specific financial details of those transactions are largely ignored and unregulated.  This tendency to overlook the grittier details of the trade in human tissues leaves courts with little guidance for deciding a case like the one at bar.  A court is an ill-suited forum for

_____

[6]See Ga. Code § 11-2-316.

resolving such public policy issues.  Fortunately, resolution of this case does not require the Court to venture into this unmapped territory.   These contracts would violate the public policy of Georgia even if Hyde and Bearden were selling the mundane nuts and bolts of ordinary commercial transactions.

As discussed above, it is well-established that exclusive dealing contracts lacking territorial limitations are unenforceable under Georgia law. PCS Joint Venture, 465 S.E.2d at 714 (by "both constitutional and legislative provision," Georgia prohibits agreements in general restraint of trade, and Georgia Courts have concluded that exclusive dealing contracts which lack territorial limitations, thereby excluding all other competition from selling and distributing the particular product, are unlawful restraints of trade under Georgia law).  SSBI's failure to show that the three-year duration of the restrictions is reasonable in these circumstances makes the Donor Contracts even more questionable. Accordingly, because the restrictions are overbroad regardless of the scope of the contracts, this Court need not

speculate on the appropriateness of restricting donations by blood donors in general, or on the appropriateness of restrictions in these circumstances.[7]

    4.    Reformation.

SSBI contends this Court may reform the Donor Contracts because reformation is specifically contemplated by the Contracts and is appropriate under Georgia law, citing *Hicks v. Doors by Mike, Inc.*, 579 S.E.2d 833, 836 (Ga. App. 2003) (Doc. 69, p. 12). However, Georgia law does not permit reformation of overbroad covenants in every circumstance. In *Hicks*, a seller signed a noncompetition agreement in connection with the sale of his business and the appellate court recognized that the trial court could "blue pencil" covenants into more limited form if the covenants were ancillary to the sale of a business. While Georgia permits the "blue-penciling" of overbroad covenants in contracts ancillary to the sale of a business, an overreaching and unenforceable covenant ancillary to employment cannot be reformed and its presence automatically renders otherwise valid, non-solicitation or non-competition covenants in the same agreement unenforceable. *Palmer & Kay, Inc. v. Marsh & McLennan Co., Inc.*, __ F.3d

---

[7]The SBS Movants further argue the Donor Contracts are unenforceable because they lack mutuality of obligation. The Court need not address this issue in view of the conclusion that the contracts are void restraints of trade.

_, 2005 WL 737048 (11th Cir. April 1, 2005).  SSBI has not pointed to any

Georgia law which would permit reformation of these Donor Contracts, which

are most akin to the employment contracts that cannot be "blue-pencilled"

in Georgia.  Neither has it suggested how the contracts might be reformed

so that they are not overreaching.  Because SSBI has not shown that it is

entitled to this equitable relief, the Donor Contracts will not be reformed.

B.    The Motion for Summary Judgment by SBS and David Morad.[8]

SSBI claims that SBS and David Morad tortiously interfered with the

contracts between SSBI and its donors.  (CV-04-CO-1351-S, Doc. 9, Count II.)

SSBI also claims that its donor list and files constitute confidential trade

secret information which SBS and David Morad misappropriated in violation

of Ala. Code § 8-27-3.  (*Id.*, Count I.)  Finally, SSBI claims David Morad

breached his confidentiality agreement with SSBI by taking and using SSBI's

donor list or information copied from SSBI's files for the purpose of soliciting

---

[8]David Morad is Joseph Morad's son and was an employee of Bio-Lab, Inc. until 1997. When SSBI acquired Bio-Lab from Joseph Morad and others, David  Morad became an employee of SSBI. David Morad resigned from SSBI in December 1999 and now owns Southern Blood Services, Inc. in Nashville, Tennessee ("SBS Tennessee"). SBS Tennessee handles the marketing of diagnostic plasma for SBS and supplies SBS with an inventory of red blood cells.  SBS handles the marketing  of therapeutic plasma for SBS Tennessee.  (CV-04-CO-0710-S, Doc. 77,  ¶¶ 93-104.)

SSBI donors and collecting blood donations from them.  *(Id.*, Count III.)  SBS

and David Morad seek summary judgment as to all of these claims.

        1.    Tortious Interference.

    SSBI claims that SBS and David Morad tortiously interfered with the

contracts between SSBI and its donors.[9] The claim fails because SSBI has not

shown that it had valid, enforceable contracts with the donors under Georgia

law. *See  Parsons v. Aaron*, 849 So. 2d 932, 946 (Ala. 2002); *Tom's Foods Inc.*

*v. Carn*, 896 So. 2d 443 (Ala. 2004); *Soap Co. v. Ecolab*, Inc., 646 So. 2d 1366,

1371 (Ala. 1994), citing *Gross v. Lowder Realty*, 494 So. 2d (Ala. 1986), citing

Restatement (Second) of Torts § 767 (1977).  SBS and David Morad's motion

for summary judgment will be granted as to this claim.

        2.    Misappropriation of Trade Secrets.

    SSBI claims that its donor list and files constitute confidential trade

secret information which SBS and David Morad misappropriated in violation

of Ala. Code § 8-27-3.  (CV-04-CO-1351-S, Doc. 9, Counterclaim Count I.)  SBS

---

[9]The Court is aware that a tortious interference claim can be based on interference with contractual or with business relations.  Although SBS and Morad seek a declaration that they did not interfere with SSBI's business relations, SSBI has made it clear that its counter claim is based solely on SBS and Morad's alleged interference with its contractual relations with donors.  (CV-04-CO-1351-S (Doc. 9, Count II, ¶¶ 37-41); (Doc. 55, pp. 26-27); (Doc. 69, pp. 14-19); (Doc. 72, p. 10.))

and Morad contend they are entitled to summary judgment on this claim because there is no evidence of misappropriation and because the names of donors and information in donor files were known to SBS and David Morad as a result of their long-standing relationship with the donors prior to the sale of Bio-Lab to SSBI.  In response, SSBI argues that its trade secret claim is based on information placed in the donor files after the 1997 purchase of Bio-Lab, "including the times and timing of immunogen stimulation, the identity of their 'pedigree donors,' and the terms and compensation arrangements of their SSBI donor contracts."  As discussed below, the only evidence relating to misappropriation concerns the donor contracts, and there is significant evidence that the existence and content of the donor contracts was not a secret.[10]  However, SSBI correctly argues that, in these summary judgment proceedings, SBS "ha[s] not placed at issue whether any post-1997 SSBI information constitutes a trade secret."  (Doc. 69, p. 20, n. 9.)

---

[10]SSBI presented evidence showing that Bearden and Hyde had copies of their contracts so that those contracts are not "secret" information.  What constitutes a trade secret is a question of fact. *Public Systems, Inc. v.  Towry*, 587 So. 2d 969, 972 (Ala. 1991).  However, in view of the undisputed evidence that Bearden and Hyde had copies of their donor contracts, no reasonable jury could conclude the contracts were trade secrets of SSBI.  "As stated in the comments to § 8-27-2, '[p]aragraph (d) is intended to disallow from trade secret protection information that is readily available and does not require substantial research investment to obtain." *Towry*, 587 So. 2d at 972.

SBS and Morad argue that SSBI has not pointed to any evidence of misappropriation of this post-1997 information.  Nevertheless, there is evidence cited elsewhere that David Morad faxed a copy of Carol Bearden's donor contract to Joseph Morad at SBS.[11]  Although SSBI does not argue that incident underpins its trade secret claim, the incident appears to meet the statutory definition of misappropriation if the donor contract is assumed to be SSBI's secret.[12]

The motion for summary judgment will be denied as to this claim.  SBS and David Morad have not established that there is no dispute of material fact regarding the misappropriation claim, and they have not shown they are entitled to judgment as a matter of law.

---

[11](CV-04-CO-0710-S, Doc. 77, Undisputed Facts, ¶¶ 93-104.)

[12]Ala. Code section 8-27-3 provides:
Misappropriation.
A person who discloses or uses the trade secret of another, without a privilege to do so, is liable to the other for misappropriation of the trade secret if:
(1) That person discovered the trade secret by improper means;
(2) That person's disclosure or use constitutes a breach of confidence reposed in that person by the other;
(3) That person learned the trade secret from a third person, and knew or should have known that (i) the information was a trade secret and (ii) that the trade secret had been appropriated under circumstances which violate the provisions of (1) or (2), above;  or
(4) That person learned the information and knew or should have known that it was a trade secret and that its disclosure was made to that person by mistake.
Id.

3.      Breach of Confidentiality Agreement by David Morad.

Morad argues he is entitled to summary judgment as to SSBI's claim that Morad breached his confidentiality agreement because he did not use information gained from SSBI to contact Bearden and he did not use the price list or other information he obtained from SSBI.  In this context, SSBI argues that Morad breached his agreement with SSBI when he faxed Carol Bearden's donor contract to Joseph Morad at SBS.  In response, SBS argues the donor contracts cannot be said to be confidential because they were provided to Bio-Lab employees in 1997.  No evidence is cited to support this assertion. As observed above, there is evidence that the donors had copies of their contracts which would seem to negate the inference that the contracts were SSBI's secret or were confidential.  *See Birmingham Television Corp. v. DeRamus*, 502 So. 2d 761, 764 (Ala. Civ. App. 1986) (evidence was insufficient to support trial court's finding of a substantial protectible interest where information was common to others in the business and were known to or easily obtainable by such others), *citing Greenlee v. Tuscaloosa Office Products and Supply, Inc.*, 474 So. 2d 669 (Ala.1985).  Nevertheless, the Court agrees with SSBI that Morad and SBS have not properly put this issue into

question in these motion proceedings and have not, therefore, met the burden of showing they are entitled to summary judgment.

      C.    The Motions for Summary Judgment by Bearden and Hyde.

SSBI claims that Carol Bearden and Anita Hyde breached their Donor Contracts with SSBI. (CV-04-CO-0710-S, Doc. 1.) Carol Bearden, joining with SBS and David Morad, (the "SBS Movants") (Doc. 59), argued she was entitled to summary judgment as to SSBI's claims for breach of contract because the Donor Contracts are unenforceable restraints of trade.  Hyde joined in this argument in her reply.  (Doc. 73.)  As discussed above, the Court agrees the contracts are void restraints of trade under Georgia law and are unenforceable.  Bearden and Hyde's motions for summary judgment will be granted.

      D.    SSBI's Motion for Summary Judgment.

SSBI argues that, regardless of the validity of the Donor Contracts, it is entitled to summary judgment as to SBS's claim for declaratory judgment because SBS lacks standing to challenge the contracts.  (Doc. 55, p. 14.)

SBS seeks a judgment declaring that:

      A.    The [Donor] Contract is void and unenforceable, for it constitutes an impermissible restraint of trade, a

> violation of public policy and a contract of adhesion; and,
>
> B. SBS's conduct does not constitute tortious interference with the business of SSBI or Gradipore and, furthermore, is justified and constitutes privileged competition; and
>
> C. Granting SBS any further or different relief which it is entitled, including costs of this matter.

(Complaint, CV-04-CO-1351-S, Notice of Removal, Doc. 1, Ex. 1.)

As a general rule, a third party cannot challenge a contract as being in restraint of trade. *Palmer v. Atlantic Ice and Coal Corp.*, 173 S.E. 424 (Ga. 1934); See 6 Williston on Contracts, section 13:28 (4th ed.); *Valley Products Co., Inc. v. Landmark*, 877 F. Supp. 1087 (W.D. Tenn. 1994). The exception is when the third-party can show a special injury distinct from the injury suffered by the average citizen. *Blackmon v. Gulf Life Ins. Co.*, 175 S.E. 798 (Ga. 1934); Compare *Alta Anesthesia Associates of Georgia, PC v. Gibbons*, 537 S.E.2d 388 (Ga. App. 2000) (anesthesiologist had standing to sue anesthesia professional corporation for tortious interference with business relations and breach of settlement agreement even though she was not a party to corporation's service contract with hospital) and *Glynn-Brunswick Mem. Hosp. Auth. v. Gibbons*, 530 S.E.2d 736 (Ga. App. 2000) (anesthesiologist was not entitled to declaratory judgment that exclusive

services contract was illegal and void because declaration would amount to advisory opinion in that it would not affect her legal interests).

The requested declaration in this case would not affect SBS's future legal rights, and would, therefore, amount to an advisory opinion like the declaration sought in *Glynn-Brunswick Memorial Hospital*.  Because SBS has not established that its request is outside the general rule prohibiting a third-party challenge to a contract based on a claim that the contract is in restraint of trade, SSBI's motion for summary judgment will be granted as to SBS's request for declaratory judgment.

IV.    Conclusion.

For the reasons set forth herein, SSBI's Motion for Summary Judgment (Doc. 54) will be granted, and the complaint for declaratory judgment in CV-04-CO-1351-S will be dismissed.

Anita Hyde's Motion for Summary Judgment (Doc. 56) will be granted and CV-04-CO-0710-S will be dismissed.

The Motion for Summary Judgment of SBS, Morad and Bearden (Doc. 59) will be granted in part and denied in part.  All claims against Bearden in CV-04-CO-2589-S will be dismissed.  SSBI's claim for tortious interference against

SBS and Morad will be dismissed.  The remainder of the motion will be denied.

The Motion to Strike (Doc. 70) relates to material which had no bearing on the motions for summary judgment and is moot.

Done this <u>20th</u> day of <u>June 2005</u>.

L. SCOTT COOGLER
UNITED STATES DISTRICT JUDGE
124153